**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Donald FINNEY, Patricia Finney and Richard A. Kelley, Defendants-Appellants.**

**No. 82–2553**

**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Aug. 29, 1983.

Rehearings Denied Oct. 11, 1983.

Michael Ramsey, Houston, Tex., for Finneys.

Wendell A. Odom, Jr., Houston, Tex., for Kelley.

James R. Gough, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEE, POLITZ and JOHNSON, Circuit Judges.

POLITZ, Circuit Judge:

Donald Finney, Patricia Finney and Richard A. Kelley were indicted for eight counts of mail fraud, 18 U.S.C. § 1341, arising out of their business operation in Houston, Texas, variously known as Consumer Hotline, Promotional Advertising Services, and Responsive Advertising Services. The jury returned verdicts of guilty on all counts against all defendants. The trio timely appealed, each challenging the sufficiency of the evidence. Finding the evidence sufficient to sustain the jury's verdicts, we affirm.

*Facts*

Consumer Hotline was engaged in soliciting business listings for the purpose of referring potential consumers. Upon inquiry, and without cost to the caller, Consumer Hotline would refer customers to a business located in the caller's zip code area or in a neighboring zip code area. Referrals were made only to businesses which were listed with Consumer Hotline. The price of listing ranged from $200 to $370. Consumer Hotline purported to function as a means by which small businesses could advertise to the general public.

In April 1981, appellants filed trade name certificates, leased office space, rented office furniture and installed telephones. Telephone solicitors were hired to contact

area businesses and solicit listings. Others were hired to visit businesses and make personal solicitations. Solicitors were hired and trained by Kelley and paid by Donald Finney, who shared business decisions with Kelley. Patricia Finney functioned as secretary and receptionist for Consumer Hotline, filed the assumed name certificates, endorsed checks payable to Consumer Hotline and was involved, along with Donald Finney and Kelley in the day-to-day operations.

The solicitors were instructed to misrepresent Consumer Hotline's capability and the services it would perform. Pursuant to oral and written directions, solicitors misrepresented the number of consumer inquiries received daily (claiming an average of 200; the evidence reflected 4 or 5); made firm promises of a precise increase in a lister's business, promising to continue referral services without charge until the guaranteed increase was reached; promised television advertising which never materialized; and misrepresented their contacts with consumer groups and other listing businesses. Solicitors were instructed to promise private schools 20 additional students regardless of the size of the school. The representations went far beyond mere "puffing" of the product.

When customers complained that they were not receiving any referrals, Kelley responded that it took 30 days to place their business operation on the computer, thus delaying the promised business increase. Consumer Hotline neither had its own computer nor access to a computer when these representations were made. The guarantees of a specified business increase were made without even the semblance of an analysis of the applicable market.

In approximately four months of operation, Consumer Hotline incurred the following indebtednesses: the Houston Chronicle and Houston Post, in excess of $14,000; radio station KGOL, in excess of $5,000; the telephone company, a sum approaching $2,000; together with sums due to the landlord and furniture lessor. Including future lease payment obligations, Consumer Hot-

line owed its creditors more than $40,000 when the operation ceased in the late summer of 1981. By then it had contracted with many small businesses and accepted fee payments.

In September 1981, when promises began to run thin, Consumer Hotline wrote its customers and advised that business would be interrupted temporarily while they moved into new offices. However, there were no further communications or notices to creditors, the landlord, or the business concerns to whom services were promised and were contractually due. Appellants departed Houston for Tulsa where they began operations anew.

### The Law

The mail fraud statute, 18 U.S.C. § 1341, provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Conviction of mail fraud requires proof of a scheme to defraud involving use of the mails. *United States v. Goss,* 650 F.2d 1336 (5th Cir.1981). There must be proof of the defendant's specific intent to commit fraud. *United States v. Freeman,* 619 F.2d 1112 (5th Cir.1980). This intent may be proven by direct or circumstantial evidence. *United States v. Prince,* 496 F.2d 1289 (5th Cir.1974).

Mail fraud entails (1) the scheme to defraud, and (2) the causing of the use of the mails for the purpose of executing the scheme. *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). While the mailing must, as the statute requires, be "for the purpose of executing the scheme, ... it is not necessary that the scheme contemplates the use of the mails as an essential element." *United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). It is sufficient if the mailing that is caused is "a part of the execution of the fraud," *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944), or is "incident to an essential part of the scheme." *Pereira,* 347 U.S. at 8, 74 S.Ct. at 362. One "causes" the mail to be used when one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended. *United States v. Kenofskey,* 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836 (1917). A defendant need not personally handle the mail; there need only be sufficient evidence to connect him to the fraudulent scheme involving the use of the mails. *Milam v. United States,* 322 F.2d 104 (5th Cir.1963).

Appellants contend that the evidence presented at trial was insufficient to establish guilt. It is our charge to determine not what we might conclude as triers of the fact, but what a reasonable jury could conclude. *United States v. Alonzo,* 681 F.2d 997 (5th Cir.1982). "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government." *United States v. Glasser,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Accepting all credibility choices and reasonable inferences the jury could have made to support its verdict, an appellate court may reverse only upon concluding that a reasonable jury would have been compelled to find that guilt was not proven beyond a reasonable doubt. *United States v. Robinson,* 700 F.2d 205 (1983);

*United States v. Saxton,* 691 F.2d 712 (5th Cir.1982).

### Fraudulent Scheme

The "scheme to defraud" element of the offense of mail fraud is not defined according to technical standards; there are no hard and fast rules. *United States v. Bruce,* 488 F.2d 1224 (5th Cir.1973). The scheme need not be fraudulent on its face, it need only involve fraudulent representations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. In this case misrepresentations abound. Customers were touted with nonexistent television advertising, nonexistent manifold daily inquiries, nonexistent co-listees, and a nonexistent computer. They were induced to purchase unavailable services and had their concerns lulled by false representations. The latter has been found to be a strong indication of fraud in § 1341 cases, *United States v. Netterville,* 553 F.2d 903 (5th Cir.1977), as have reckless promises of performance which have no factual basis or reasonable expectation. *United States v. Cohen,* 516 F.2d 1358 (8th Cir.1975).

The government contended that the entire operation reflected more than simply slipshod business practices, as urged by appellants, but was the product of a specific intent to defraud. The record contains credible evidence to support this contention. "The evidence need not exclude every reasonable hypothesis of innocence or be consistent only with a finding of guilt, since a jury is free to choose among reasonable constructions of the evidence." *United States v. Robinson,* 700 F.2d at 209. The record contains evidence sufficient to allow a reasonable juror, making the credibility choices that are within the jury's exclusive province, to conclude that the appellants acted with the requisite specific intent and entered into a fraudulent scheme.

### Use of the Mails

In *Pereira,* the Supreme Court held that one causes the mails to be used when he "does an act with knowledge that the use of

the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended...." 347 U.S. at 8–9, 74 S.Ct. at 362–63. Appellants relied on several mailings in furtherance of their scheme. They communicated with their customers, they communicated with their creditors. The evidence suffices to permit a jury to draw reasonable inferences and conclude that appellants used the mails in a manner proscribed by the mail fraud statute. *United States v. Alonzo.*

All convictions are AFFIRMED.